Christianna A. Cathcart, Esq.
Bar No. ND0008
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 655-2066
christianna@dcbankruptcy.com
*Counsel for the Debtor*

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 26-00183 |
| | ) | (Chapter 11) |
| Life Stride, Inc. | ) | |
| | ) | |
| Debtors. | ) | |

### MOTION FOR WAIVER OF
### APPOINTMENT OF PATIENT CARE OMBUDSMAN

Comes now Life Stride, Inc. ("Life Stride" or the "Debtor"), by and through undersigned counsel, pursuant to Sections 333 Title 11 of the United States Code and Federal Rules of Bankruptcy Procedure 2007, and move this Honorable Court to waive the appointment of a patient care ombudsman, and in support thereof states as follows:

### I.      Introduction

Life Stride is a longstanding, community based behavioral health provider that has served residents of the District of Columbia for more than twenty-five years. The Debtor provides outpatient behavioral health services, structured day programming, case management, and residential support through small, supervised group homes, all within the District's public behavioral health system. These services are delivered in non-acute, community-based settings focused on stabilization, recovery, independence, and community integration.

1

The Debtor commenced this Chapter 11 case to address cash flow constraints resulting from delays in governmental funding, not because of any issue concerning the quality, safety, or continuity of patient care. As detailed below, the Debtor's existing regulatory oversight, clinical safeguards, patient rights protections, and operational structure adequately protect its patients and residents, making the appointment of a patient care ombudsman unnecessary.

**II.      Standard**

Section 333 of Title 11 of the United States Code (the "Bankruptcy Code") provides that, "[i]f the debtor… is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business *unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case.*" 11 U.S.C. § 333(a)(1).

The Federal Rule of Bankruptcy Procedure, in turn, openly contemplate such relief and permits a party in interest to seek the appointment—or—waiver—of a patient care ombudsman by motion filed within 21 days after the commencement of the case, or within such other time as the Court may direct. Fed. R. Bankr. P. 2007.02.

**III.     Argument: Appointment of a Patient Care Ombudsman Is Not Necessary.**

Appointment of a patient care ombudsman is unnecessary here. Although the Debtor is a "health care business" under section 101(27A) of the Bankruptcy Code, courts have declined to appoint an ombudsman where existing regulatory oversight, internal safeguards, and patient rights mechanisms sufficiently protect patient interests. In determining whether appointment is necessary, courts apply a practical, fact specific analysis and consider, among other factors:

> (1) the cause of the bankruptcy; (2) the presence and role of licensing or supervising entities; (3) Debtor's past history of patient care; (4) the ability of the patients to

protect their rights; (5) the level of dependency of the patients on the facility; (6) the likelihood of tension between the interests of the patients and the debtor; (7) the potential injury to the patients if the debtor drastically reduced its level of care; (8) the presence and sufficiency of internal safeguards to ensure an appropriate level of care; and (9) the impact of the cost of an ombudsman on the likelihood of successful reorganization.

*In re Valley Health Sys.*, 381 B.R. 756, 761 (Bankr. C.D. Cal. 2008); *In re Alternate Family Care*, 377 B.R. 754, 758-59 (Bankr. S.D. Fla. 2007). Courts may also consider related circumstances, including the quality of patient care, the debtor's financial ability to maintain that care, the existence of internal monitoring or ombudsman like functions, and the degree of governmental or professional oversight such that further appointment would be duplicative. *In re Sameh H. Aknouk, Dental Servs., P.C.*, 648 B.R. 755, 761 (Bankr. S.D.N.Y. 2023); *Valley Health*, 381 B.R. at 761 (citing 3 Collier on Bankruptcy ¶ 333.02, at 333-4 (15th ed. 2007); 3 Collier on Bankruptcy ¶ 333.02[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012). As demonstrated below, those considerations weigh against appointment here.

First, the cause of the bankruptcy weighs against appointment of a patient care ombudsman. The Debtor sought bankruptcy protection to address cash flow constraints arising from delays in governmental funding—challenges wholly unrelated to the quality, safety, or continuity of patient care. *See Valley Health*, 381 B.R. at 761 (finding ombudsman unnecessary where bankruptcy was driven by financial distress rather than patient care concerns); *see also Alternate Family Care*, 377 B.R. at 759; *In re Pediatrics at Whitlock, P.C.*, 507 B.R. 10,11 (Bankr. N.D. Ga. 2014).

Second, comprehensive regulatory oversight renders additional supervision unnecessary. As a certified provider in the District of Columbia's public behavioral health system, the Debtor operates under the active and ongoing supervision of the District of Columbia Department of Behavioral Health ("DBH"), pursuant to Title 22-A of the District of Columbia Municipal Regulations. Courts have declined to appoint ombudsmen where substantial governmental or

3

professional oversight provides meaningful safeguards for patient care. *See Valley Health*, 381 B.R. at 761–62; *Aknouk*, 648 B.R. at 764.

DBH oversight is substantive and enforceable. Certification to provide mental health rehabilitation services requires evaluation of the provider's capacity to deliver care in accordance with District standards—including site surveys, record access, staff and consumer interviews, corrective action requirements, and, where necessary, denial or decertification for noncompliance. *See* 22-A D.C.M.R. §§ 3401.1, 3401.2, 3401.5, 3401.6, 3401.8–3401.17, 3403.1, 3403.15. Residential operations are subject to additional safeguards, such as regular inspections, record review, staff and resident interviews, complaint-based investigations, deficiency notices, plans of correction, follow-up inspections, and corrective actions to ensure resident health and safety. *See* 22-A D.C.M.R. §§ 3800.1, 3801.1, 3803.1–3803.3, 3811.1–3811.5, 3813.3–3813.6.

DBH oversight extends beyond certification and inspection to directly address core patient care concerns. Providers must maintain patient rights and grievance procedures, treatment and recovery planning, clinical supervision and peer review, and comprehensive quality improvement programs. *See* 22-A D.C.M.R. §§ 3409.3–3409.9, 3413.7, 3413.12, 3413.28. In addition, DBH operates an ombudsman office through which consumers can raise concerns about programs and certified providers. Taken together, these mechanisms supply meaningful external supervision over the same patient care concerns that a patient care ombudsman would otherwise monitor, rendering appointment duplicative.

Third and fourth, the Debtor's history of patient care and mechanisms for protecting patient rights further weigh against appointment. Courts consider whether a debtor has a history of compromising patient care or patient rights, and whether it maintains effective internal quality controls and monitoring. *Aknouk*, 648 B.R. at 764; *Valley Health*, 381 B.R. at 762. The Debtor has

provided behavioral health services for more than twenty-five years and is not aware of any findings of malpractice, regulatory sanctions, unresolved deficiencies, or compromises of patient care or rights. Beyond its history, the Debtor maintains consumer rights and grievance procedures, regular staff training, and multiple avenues for consumers to raise concerns. Internal controls include clinical supervision, treatment plan and chart reviews, incident review, quality improvement monitoring, consumer satisfaction review, and corrective action planning, ensuring that patient concerns are identified and addressed in the ordinary course.

Fifth, sixth, and seventh, the level of patient dependency, the likelihood of tension between the Debtor's and patients' interests, and the potential injury to patients if the Debtor reduced its level of care are appropriately considered together. Courts analyze these factors in light of the specific facts presented, including the nature of the services, the degree of patient reliance, the availability of alternative care or advocacy, and whether any reduction in care would advance the debtor's reorganization. See *Aknouk*, 648 B.R. at 765; *In re Smiley Dental Arlington, PLLC*, 503 B.R. 680, 689 (Bankr. N.D. Tex. 2013); *Pediatrics at Whitlock*, 507 B.R. at 10, 11. Courts have found little likelihood of tension where the debtor's continued operations depend on maintaining quality care, patient trust, referral relationships, regulatory compliance, and licensure. See *Smiley Dental*, 503 B.R. at 689; *In re Flagship Franchises of Minn., LLC*, 484 B.R. 759, 763–66 (Bankr. D. Minn. 2013).

Here, while certain patients and residents depend on the Debtor for important behavioral health, residential, rehabilitative, and supportive services, that dependency exists within a regulated, community-based system designed to preserve continuity of care and support safe transitions when necessary. The Debtor's restructuring does not relieve it of its obligations to patients and residents. To the extent any reduction, transition, or closure of residential services

becomes necessary, those actions must be addressed through the District's behavioral health framework and applicable DBH oversight, including patient rights protections, case management, residential safeguards, continuity of care requirements, and procedures governing transfer, relocation, and closure. These safeguards mitigate the risk of abrupt or unmanaged disruption to patient care.

A disorderly reduction in services or abrupt transition would undermine, not advance, the Debtor's reorganization by jeopardizing patient trust, regulatory compliance, DBH certification, facility licensing, referral relationships, and operational stability. The Debtor's financial and operational interests are therefore aligned with the interests of its patients and residents in preserving quality care and continuity of services. In light of the existing regulatory framework, transition safeguards, and the Debtor's own interest in maintaining continuity of care, appointment of a patient care ombudsman is not warranted.

Eighth, the presence and sufficiency of internal safeguards further weigh against appointment. In addition to the external oversight described above, the Debtor maintains internal clinical and operational controls designed to ensure an appropriate level of patient care. Community-based mental health services are delivered under structured, qualified, and documented supervision, with oversight focused on medical necessity, staff competency, treatment planning, consumer progress, and service delivery. The Debtor's quality improvement structure further supports patient care monitoring. Through its quality improvement committee, the Debtor monitors performance indicators, conducts internal audits and chart reviews, tracks incidents, reviews consumer satisfaction feedback, implements corrective action plans, and performs annual performance analyses. The Debtor also uses electronic health records to support care coordination, track treatment progress, and provide data for ongoing quality review. Together, these safeguards

create a layered system for monitoring patient needs, identifying concerns, correcting deficiencies, and supporting continuity of care.

Ninth, although cost is not the primary basis for the relief requested, it remains relevant where, as here, existing safeguards already protect patients and residents. The Debtor seeks to preserve operations, maintain continuity of care, and reorganize for the benefit of patients, residents, employees, and creditors. Imposing the additional administrative expense of a patient care ombudsman would divert limited estate resources from the Debtor's restructuring efforts and ongoing operations without providing a corresponding benefit to patient care. Where an ombudsman would duplicate existing regulatory, clinical, and operational protections, courts have found that the cost weighs against appointment. *See, e.g.*, *Aknouk*, 648 B.R. at 766; *In re Miss. Maternal-Fetal Med., P.A.*, No. 21-00091, 2021 WL 1941627, at *3–4 (Bankr. S.D. Miss. Feb. 18, 2021).

Taken together, the relevant factors demonstrate that the Debtor's existing regulatory, clinical, operational, and patient rights safeguards are sufficient to protect patients and residents without the additional appointment of a patient care ombudsman.

**IV.    Conclusion**

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) determine that the appointment of a patient care ombudsman is not necessary for the protection of patients; (ii) waives the appointment of a patient care ombudsman; and (iii) grant such other and further relief as the Court deems just and proper.

*[Signature on Following Page]*

Respectfully submitted,

Dated: May 6, 2026          By:     /s/ Christianna A. Cathcart
                                    Christianna A. Cathcart, Esq.
                                    Bar No. ND0008
                                    The Belmont Firm
                                    1050 Connecticut Avenue, NW
                                    Suite 500
                                    Washington, DC 20036
                                    Phone: (202) 655-2066
                                    christianna@dcbankruptcy.com
                                    *Counsel for the Debtor*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of May 2026, a copy of the foregoing was served electronically upon filing via the ECF system, with copies being sent to all parties receiving electronic notice herein.

/s/ Christianna A. Cathcart
Christianna A. Cathcart

8