Docusign Envelope ID: 5F5E2ABF-0C6C-8633-835C-1B07B39E9279

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 26-00183 |
| | ) | (Chapter 11) |
| LIFE STRIDE, INC. | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

**DECLARATION OF LEONARD LUCAS IN SUPPORT OF DEBTOR'S
MOTION FOR WAIVER OF APPOINTMENT OF PATIENT CARE OMBUDSMAN**

1. My name is Leonard Lucas. I am over the age of eighteen, and I am competent to testify to the matters set forth herein.

2. I am the Chief Operating Officer of Life Stride, Inc. ("Life Stride" or the "Debtor"). In that capacity, I am familiar with the Debtor's business affairs, day-to-day operations, regulatory oversight, governmental contracts, compliance systems, quality improvement procedures, patient care safeguards, residential operations, and restructuring efforts.

3. I make this declaration (the "Declaration") in support of the Debtor's Motion for Waiver of Appointment of Patient Care Ombudsman (the "Motion"). Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

4. Life Stride is a community based behavioral health organization, and a District of Columbia Department of Behavioral Health certified provider that has served the mental health needs of the District of Columbia community for more than twenty-five years. Life Stride provides services within the District of Columbia public behavioral health system, including psychiatric treatment, counseling, group therapy, case management, housing support, rehabilitation day

1

programming, adult day programming, substance abuse services, supported employment services, and residential support services.

5.    Life Stride's services are provided in community based, non-acute settings, including outpatient services, day programming, and supervised community residence facilities. These services are focused on recovery, stabilization, functional independence, community integration, and reducing reliance on emergency or crisis-based interventions. Life Stride does not operate a hospital, emergency department, inpatient acute care unit, or skilled nursing facility.

6.    Life Stride provides services pursuant to Human Care Agreements, purchase orders, and funding arrangements with the District of Columbia Department of Behavioral Health ("DBH") and the Government of the District of Columbia, including Human Care Agreement No. CW101416 for Supported Rehabilitative Residence ("SRR") services and Human Care Agreement No. CW105115 for Mental Health Rehabilitation Services.

7.    Under the SRR Human Care Agreement, Life Stride provides residential support services for DBH consumers with severe and persistent mental illness who require supervised, community based residential support. The SRR Human Care Agreement requires providers to facilitate and sustain community tenure for DBH enrolled individuals, including through twenty-four-hour staff supervision, onsite rehabilitation, personal assistance, coordination with Core Service Agencies, crisis and emergency planning, and support with activities of daily living.

8.    These Human Care Agreements and related purchase orders reflect DBH's ongoing involvement in authorizing, funding, monitoring, and regulating the services provided by Life Stride.

9.    Life Stride maintains a comprehensive quality improvement and compliance structure designed to support consumer outcomes, service effectiveness, DBH compliance,

Medicaid compliance, CARF standards, operational accountability, and ongoing readiness for audits, certification, and accreditation.

10.     Life Stride maintains a formal Quality Improvement Committee responsible for reviewing performance data and trends, identifying areas for improvement, approving quality improvement projects and corrective action plans, monitoring implementation and outcomes, and supporting compliance with DBH, DHCF, and CARF standards.

11.     Life Stride's quality improvement process includes monitoring treatment plan completion, documentation compliance, consumer outcomes, hospitalization and crisis utilization rates, grievance trends, incident reports, audit findings, service utilization, appointment adherence, staff productivity, consumer satisfaction, and other service quality indicators.

12.     During the 2025 reporting period, Life Stride's internal performance analysis reflected that 92% of treatment plans were completed timely, documentation compliance was 95%, 76% of individuals demonstrated measurable improvement in functioning, 85% of individuals began services within seven days, and 100% of critical incidents were reported timely.

13.     During that same reporting period, Life Stride's internal performance analysis identified no major compliance violations and no major safety violations.

14.     Life Stride maintains written policies and procedures governing consumer rights, grievance procedures, confidentiality, abuse prevention, incident reporting, treatment participation rights, and protection against retaliation.

15.     Consumers are informed of their rights and grievance procedures upon admission to services. Consumers may submit grievances verbally, in writing, or through a family member or advocate.

16.     Life Stride's grievance procedures require complaints to be documented, reviewed, investigated, and resolved. Consumers are not to be retaliated against for submitting grievances or raising concerns.

17.     In addition to Life Stride's internal grievance procedures, consumers may contact DBH or other advocacy resources if they have concerns regarding services, rights, safety, or care.

18.     Life Stride maintains structured supervision policies for community based mental health services. Life Stride requires staff providing community based mental health services to receive appropriate supervision by qualified practitioners in accordance with DBH requirements.

19.     Life Stride's supervision process includes review of clinical cases and interventions, assessments, treatment plans, consumer progress, service needs, clinical skill development, staff competency, and clinical documentation.

20.     Supervisors are required to review clinical documentation for accuracy and completeness, ensure records reflect current consumer status, confirm updates to treatment based on changes in condition, and address documentation deficiencies promptly.

21.     Life Stride filed for Chapter 11 relief to address cash flow constraints, reimbursement delays, purchase order delays, authorization issues, receivable delays, and other funding related disruptions. The bankruptcy filing was not caused by any issue concerning the quality, safety, or continuity of patient care.

22.     Life Stride has no intention of reducing the quality of care or services provided to consumers because of the bankruptcy filing. Patient safety, consumer rights, continuity of care, regulatory compliance, and appropriate service delivery remain central to Life Stride's operations.

23.     Certain residential facilities have closed or may close as part of Life Stride's operational restructuring and financial stabilization efforts. Those residential transitions have been,

and will continue to be, addressed through applicable DBH requirements, continuity of care obligations, case management procedures, residential safeguards, and consumer transition planning.

24.     Life Stride does not intend for any residential transition, relocation, reduction, or closure to occur in a manner that would compromise consumer safety or continuity of care.

25.     To my knowledge, Life Stride is not currently subject to any outstanding patient care litigation, major patient care related enforcement action, unresolved regulatory deficiency requiring emergency intervention, or finding of widespread patient harm requiring appointment of a patient care ombudsman.

26.     To my knowledge, the bankruptcy filing has not created any conflict between Life Stride and its consumers regarding the quality, safety, or continuity of services. Life Stride's continued operations depend on maintaining consumer trust, regulatory compliance, DBH relationships, referral relationships, service quality, and operational stability.

27.     Based on Life Stride's existing DBH oversight, contractual oversight, internal quality improvement systems, supervision policies, grievance procedures, compliance infrastructure, audit systems, incident review procedures, consumer rights protections, and ongoing monitoring of patient care and service delivery, and upon consultation with counsel, I believe the appointment of a patient care ombudsman is not necessary for the protection of patients in this case.

28.     Appointment of a patient care ombudsman would impose an additional administrative expense on the estate and would substantially duplicate existing regulatory, compliance, quality assurance, clinical, and operational oversight systems already in place.

29.     Given Life Stride's current cash flow constraints, additional administrative expenses reduce resources available for operations, employee compensation, regulatory compliance, and continued consumer services.

30.     For these reasons, I believe waiver of the appointment of a patient care ombudsman is appropriate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 22, 2026.

DocuSigned by:

*Leonard Lucas*
CEFAF55F28D742C...
Leonard Lucas