IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 26-00183 |
| | ) | (Chapter 11) |
| LIFE STRIDE, INC. | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

## DEBTOR'S SUBCHAPTER V PLAN OF REORGANIZATION

Comes now Life Stride, Inc. ("Life Stride" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A, and provides the following plan of reorganization (the "Plan") herein:

### Background for Cases Filed Under Subchapter V

**a. Description and History of the Debtor's Business**

The Debtor is a District of Columbia corporation with its principal place of business at 3005 Bladensburg Road NE, Washington, DC. Founded on July 10, 1992, by Gwendolyn Bardwell and her late husband, the Debtor has served the District's behavioral-health community for more than three decades as a provider certified by the District of Columbia Department of Behavioral Health ("DBH").

The Debtor's mission is grounded in the conviction that all people—of every race, culture, religion, and gender—are entitled to dignity, respect, and the highest quality of mental-health care, and that its consumers possess the strength to achieve their own goals when given genuine choice and support. In service of this mission, the Debtor provides individual and group treatment, counseling, psychiatric services, substance-use disorder services, supported employment, case management, and housing support to adults living with serious and persistent mental illness, most of whom are District Medicaid beneficiaries and consumers of DBH. The Debtor delivers these services through a workforce of counselors, residential aides, clinicians, and qualified service providers drawn largely from the communities it serves.

Historically, the Debtor's operations comprised two complementary lines of business. The first was residential: the Debtor operated Mental Health Community Residence Facilities ("MHCRFs")—licensed group homes providing twenty-four-hour supervised care, lodging, meals, and a home-like environment for adults whose principal diagnosis of mental illness requires around-the-clock support—at a contracted capacity of as many as sixty-two beds, in premises leased from third-party landlords in the District and the surrounding Maryland suburbs. The second was community-based: supportive and rehabilitative services delivered to consumers where they live, without the overhead of dedicated residential facilities.

Although the residential program was central to the Debtor's mission, but its economics ultimately became the source of the Debtor's financial distress—and those economics are structural, not unique to the Debtor. Under the governing regulatory framework, an MHCRF operator has no entitlement to reimbursement of its costs; it is compensated solely under its

1

contract with DBH, on a per-diem basis, subject to the availability of appropriated funds. The Debtor's contract paid a fixed per-diem—currently $126.50 per bed per day—only for beds actually occupied, subject to an annual not-to-exceed ceiling, and only after services had been rendered and invoiced. The program's costs, by contrast, were fixed and unforgiving: rent on each leased home, twenty-four-hour staffing, food, utilities, and insurance came due every month regardless of occupancy. The Debtor was thus required to finance the full operating cost of its group homes out of pocket while awaiting reimbursement—reimbursement that, in the Debtor's experience, routinely arrived weeks or months behind its performance.

For years the Debtor bridged the gap between the residential program's fixed operating costs and its occupancy-dependent revenues. That imbalance became unsustainable in April 2025, when DBH, though Modification M0005 to Contract No. CW101416 (the "Residential Contract"), reduced the program's maximum contracted capacity from sixty-two beds to forty-one. Although the reduction limited the Debtor's potential revenue, its existing leases and staffing obligations did not decline proportionately. The Debtor consequently fell into arrears at several leased residential locations, resulting in judgments and possession proceedings, while additional obligations to service providers and taxing authorities continued to accrue.

The Debtor did not arrive at bankruptcy passively. In response to the capacity reduction, management undertook to right-size the residential program by exiting unprofitable leased locations and consolidating operations. The arrearages that had already accumulated, together with the resulting judgments, garnishment exposure, and possession proceedings, nevertheless outpaced the Debtor's restructuring efforts. Facing the potential loss of its ability to continue operating, the Debtor commenced this case under Subchapter V of chapter 11 of the Bankruptcy Code on April 15, 2026 (the "Petition Date") and has since remained in possession of its property and continued the operation of its business as debtor in possession.

This case has provided the Debtor with what it could not achieve outside of bankruptcy: an orderly restructuring that avoids an interruption of services to its consumers. Since the Petition Date, the Debtor has continued performing under its DBH contracts and has undertaken an orderly wind-down of its residential program in coordination with DBH. As of the date of this Plan, the Debtor has closed its residential locations at 309 Varnum Street NW, Washington, DC and 1495 Saratoga Avenue NE, Washington, DC. Its two remaining locations, 11 Jefferson Street NE, presently serving six consumers, and 3800 Pope Street SE, presently serving four consumers, are expected to close on or before July 26, 2026, with the consumers residing thereat to be transitioned in coordination with DBH and without interruption of care. Unlike the residential program, the Debtor's community-based service lines do not carry the same fixed occupancy costs and continue to provide a sustainable foundation for the Debtor's operations. Upon completion of the residential wind-down, the Debtor will emerge under this Plan as a more focused and financially sustainable provider of community-based services.

### b. Liquidation Analysis & Secured Claim Valuation

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7).

In a chapter 7 liquidation, it is liberally estimated general unsecured creditors would receive a net distribution of $0.00. *See* Liquidation Analysis, attached hereto as Exhibit A (the

"Liquidation Analysis"). As set forth therein, the Debtor's assets—consisting principally of cash on deposit and modest office equipment and personal property, the Debtor's accounts receivable having proven substantially uncollectible and being ascribed no value—would yield estimated gross proceeds of $34,597.70 in a forced-sale context. After deduction of chapter 7 administrative expenses of $17,709.77, the remaining $16,877.93 would be consumed in its entirety by the blanket security interest of the U.S. Small Business Administration, whose claim of approximately $210,000.00 exceeds the liquidation value of its collateral several times over. No proceeds would remain for priority claimants, administrative claimants, or general unsecured creditors.

It bears notation that the Liquidation Analysis ascribes no value to the Debtor's pre-petition accounts receivable: those receivables arise under governmental behavioral-health contracts, are subject to the District's rights of setoff and recoupment, and the Debtor's collection experience has demonstrated that they are largely uncollectible; a chapter 7 trustee, collecting post-cessation and without the Debtor's provider relationships, would fare no better.

Moreover, even were the security interest of the U.S. Small Business Administration avoided or otherwise not enforced against the estate, no distribution to general unsecured creditors would result. Any such avoided lien would be preserved for the benefit of the estate, and the resulting proceeds would be exhausted by chapter 7 administrative expenses and priority claims long before reaching general unsecured creditors. Under either scenario, the distribution to Class 3 in a chapter 7 liquidation is $0.00

Under this Plan, by contrast, general unsecured creditors will receive aggregate distributions of $30,000.00. Because holders of Class 3 claims would receive nothing in a chapter 7 liquidation, the distribution proposed under the Plan provide Class 3 creditors with a recovery greater than they would receive upon liquidation.

### c.   Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also show that it will have sufficient cash over the life of the Plan to make the required Plan payments and to operate without the need for further financial reorganization. 11 U.S.C. § 1191(c)(3).

The Debtor's revenues derive from two Human Care Agreements with DBH. The first is the Residential Contract, under which the District exercised Option Year Three on September 29, 2025, for the period through September 28, 2026, in the not-to-exceed amount of $1,893,072.50. The Debtor is performing under the Residential Contract while completing the wind-down of its residential program, which it anticipates will conclude on or before July 26, 2026, in advance of the expiration of the current option period. The second is Contract No. CW105115, the Human Care Agreement for Mental Health Rehabilitation Services (the "Community Services Contract"), as amended, under which the District has exercised an option year extending performance through January 31, 2027. The Debtor anticipates the exercise of the remaining option years under the Community Services Contract, and the financial projections attached hereto as Exhibit B (the "Financial Projections") assume the continuation of the Debtor's community-based service revenues throughout the Plan term.

The Financial Projections set forth the Debtor's projected income, expenses, and distributable cash over the term of this Plan and are conservative in two respects. First, they reflect the cessation of all residential-program revenues and the corresponding elimination of residential

3

carrying costs as of July 26, 2026, and assume no exercise of any further option period under the Residential Contract. Second, they assume no recoveries on the Debtor's pre-petition accounts receivable, which the Debtor's post-petition collection experience has demonstrated to be largely uncollectible. As to go-forward revenues, the Financial Projections also account for the collection lag historically associated with the District's payment of invoiced amounts and assume no receipts sooner than demonstrated by the Debtor's collection experience.

The Financial Projections demonstrate that the Debtor will have sufficient net disposable income to satisfy its obligations under the Plan while continuing its operations without the need for liquidation or further financial reorganization.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.       Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

| The Plan provides for: | 1 class of secured claims; |
|---|---|
| | 1 class of priority wage and compensation claims; |
| | 1 class of general unsecured claims; and |
| | 1 class of equity interests. |

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.       Classification of Claims and Interests**

| **Section 2.01** | **Class 1** | The secured claim of the United States Small Business Administration |
|---|---|---|
| **Section 2.02** | **Class 2** | Priority wage and compensation claims |
| **Section 2.03** | **Class 3** | General unsecured creditors |
| **Section 2.04** | **Class 4** | The Debtor's equity interest |

**Article 3.       Treatment of Administrative Expense Claims and Court Costs**

| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
|---|---|---|

4

| | | |
|---|---|---|
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code will be paid in full, out of monies otherwise allocated to the payment of the Class 3 claims, on a monthly basis, commencing on the first business day of the first calendar month succeeding the effective date and continuing thereafter until such claims have been paid in full. These claims will be paid *before* the Class 3 claims. The time horizon of these payments—up to five years—is permitted under § 1191(e) of the Bankruptcy Code. |
| | | All professionals retained in this case, including Debtor's counsel and the Subchapter V Trustee, will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the effective date. Post-petition, the Subchapter V Trustee shall continue to apply for all fees in accordance with Sections 330 and 331. |
| **Section 3.03** | **Priority Tax Claims** | The Internal Revenue Service has filed a proof of claim (Claim No. 12) asserting a priority tax claim in the amount of $190,572.82. The Debtor has additionally scheduled a priority tax claim of the Comptroller of Maryland in the amount of $420,000.00, and the deadline for governmental units to file proofs of claim does not expire until October 31, 2026; the allowed amount of priority tax claims is accordingly not yet finally determined. Allowed priority tax claims shall be paid in full, with interest at the rate required by § 511 of the Bankruptcy Code, in regular installment payments, concluding not later than five years after the date of the order for relief, in accordance with § 1129(a)(9)(C) of the Bankruptcy Code, and subject to the payment priorities set forth in Class 3 hereof. |
| | | For the avoidance of ambiguity, the Debtor reserves the right to object to the amount, validity, and priority of any claim asserting priority tax status. |
| **Section 3.04** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.05** | **Prospective Quarterly Fees** | There are no prospective quarterly fees that will be due in this case. |

**Article 4.     Treatment of Claims and Interests Under the Plan**

**Class 1 – United States Small Business Administration—Impaired**

Class 1 consists of the secured claim of the U.S. Small Business Administration, asserted in the approximate amount of $210,000.00 and purportedly secured by a blanket lien on substantially all of the Debtor's personal property pursuant to UCC-1 Financing Statement No. 2020121943, filed October 7, 2020, and continued August 26, 2025.

To the extent SBA's security interest is valid and perfected, its Class 1 claim shall be treated as secured only to the extent of the value of the estate's interest in the collateral pursuant to § 506(a) of the Bankruptcy Code. The Debtor asserts that value to be $16,887.93, as set forth in the Liquidation Analysis. The Balance of SBA's claim, estimated at approximately $193,112.07, shall be treated as an unsecured claim in Class 3.

The allowed secured portion of the Class 1 claim will be paid, with interest at the rate of prime + 1% per annum, in equal quarterly installments over a period of five (5) years, commencing on the first business day of the first calendar month of the first full calendar quarter next succeeding the Effective Date, in accord with the amortization schedule attached hereto as **Exhibit C**. Payments on the allowed secured portion of the Class 1 claim shall be made directly from the Debtor's operating revenues and shall not reduce the funds allocated to Class 3 hereunder. The Class 1 claimant shall retain its lien solely to the extent of the allowed secured portion of its claim, less payments made during the life of this Plan; upon payment in full thereof, such lien shall be released, and the Class 1 claimant shall promptly terminate its financing statement of record.

**Class 2 – Priority Wage Claims (§507(a)(4))—Impaired**

Class 2 consists of the allowed unsecured claims of the Debtor's W-2 employees entitled to priority under § 507(a)(4) of the Bankruptcy Code, in an amount not to exceed $17,150.00 per claimant. The Debtor scheduled the following Class 2 claims as undisputed, liquidated, and non-contingent, which claims are deemed filed pursuant to § 1111(a) of the Bankruptcy Code:

| Claimant | Scheduled Claim | Class 2 (Priority) Amount | Class 4 (Non-Priority Amount) |
|---|---|---|---|
| Gwendolyn Bardwell | $13,064.28 | $13,064.28 | |
| Jerome Lewis | $25,906.37 | $17,150.00 | $8,756.37 |
| Joyce Drumming | $11,942.00 | $11,942.00 | |
| Robin Crim | $2,870.92 | $0.00 | |
| Spencer Johnson | $7,136.92 | $7,136.92 | |

6

| Theresa Graneau | $11,212.20 | $11,212.20 | |
|---|---|---|---|
| **Total** | **$72,132.69** | **$60,505.40** | **$11,627.29** |

Allowed Class 2 claims will be paid in full, without interest, in equal quarterly installments, commencing on the first business day of the first calendar month of the first full calendar quarter next succeeding the Effective Date, subject to the payment priorities set forth in Section 3.02, Section 3.03, and the Class 3 treatment herein. Only the priority portion of each such claim is included in Class 2 and only the priority portion of each such claim is being afforded this treatment; the non-priority portion of each such claim is included in Class 3.

The claim of Jerome Lewis arises from the same obligation underlying District of Columbia Wage Order No. 25-WP-6284, which obligation is also scheduled in favor of the DC Treasurer, Office of Wage-Hour. For the avoidance of ambiguity, the Debtor's obligation under Wage Order No. 25-WP-6284 shall be paid once, to the party lawfully entitled to receive payment thereunder, and any payment made on account of such obligation to either the Class 2 claimant or the DC Treasurer shall reduce, dollar for dollar, and upon payment in full shall fully satisfy, the claims of both.

For the avoidance of ambiguity, no claim shall receive Class 2 treatment unless and until allowed as a priority claim. Claims scheduled by the Debtor as owing to independent contractors, and proofs of claim filed by persons engaged by the Debtor as independent contractors—including Claim Nos. 1,2,3,5,6,9, and 13 to the extent each asserts priority under § 507(a)(4)—are disputed as to priority, shall be treated as Class 3 claims unless and until allowed as priority claims by Final Order, and shall receive no distribution as Class 2 claims pending such allowance.

**Class 3 – General Unsecured Creditors—Impaired**

Class 3 consists of all allowed unsecured claims against the Debtor not entitled to priority under § 507(a) of the Bankruptcy Code and not otherwise classified under this Plan. Class 3 includes, without limitation: (i) claims of persons engaged by the Debtor as independent contractors, including Claim Nos. 1,2,3,5,9, and 13 to the extent reclassified as non-priority claims; (ii) the non-priority portions of the claims of Jerome Lewis ($8,756.37) and Robin Crim ($2,870.92); (iii) claims arising from unexpired leases or the rejection of unexpired leases, including any claim under Claim Nos. 6 and 7, subject to the cap imposed by § 502(b)(6) of the Bankruptcy Code; (iv) judgment and litigation claims; (v) trade, utility, insurance, and credit card claims; and (vi) any allowed deficiency claim of the Class 1 claimant.

Subject to the limitations set forth below, Class 3 shall receive quarterly payments for a period of five years, commencing on the first business day of the first calendar month of the first full calendar quarter next succeeding the Effective Date. Such payments shall be disbursed pro rata among holders of allowed Class 3 claims, subject to the other limitations set forth herein, including the provisions governing *de minimis* distributions.

Distributions to Class 3 shall commence only after all allowed administrative expense claims under Section 3.02, priority tax claims under Section 3.03, and Class 2 claims have been paid in full. Class 3 shall receive no distribution in any calendar quarter until those claims have been satisfied in full. Any funds remaining in the quarter in which the final such claim is paid shall be added to the distribution payable to Class 3 in the following calendar quarter.

**Class 4 – Equity Interest—Unimpaired**

Class 4 consists of the equity interests in the Debtor, all of which are held by Gwendolyn Bardwell. Ms. Bardwell shall retain her equity interests, with all legal, equitable, and contractual rights attaching thereto unaltered.

The holder of Class 4 interests shall receive no distribution, dividend, return of capital, or other payment under this Plan on account of such interests. For the avoidance of ambiguity, nothing herein shall prohibit payment of reasonable compensation to Ms. Bardwell for services rendered to the Reorganized Debtor in an officer, director, or employee capacity, consistent with the Financial Projections; provided, however, that no dividend or other distribution on account of equity shall be made unless and until all payments required under this Plan have been made.

Ms. Bardwell is an insider of the Debtor within the meaning of § 101(31) of the Bankruptcy Code and also holds claims against the Debtor treated in Class 2 and Class 3. Such claims are separately classified and treated in accordance with their legal character, and nothing in this Class 4 shall affect, enhance, or diminish the treatment of such claims; provided that any distribution to Ms. Bardwell on account of such claims shall be subject to the same allowance procedures, objection rights, and reserve provisions applicable to all claims in the respective classes.

**Article 5.    Allowance and Disallowance of Claims**

**Section 5.01  Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02  Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03  Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04  Timing for Dispute of Claims**. The Debtor will file objections to any disputed claims (except those deemed disputed on the Debtor's schedules where no proof of claim was thereafter filed) within six (6) calendar months of the effective date, *except* any objection to the claim of any governmental tax creditor may be filed at any time within ninety (90) days of the date on which such claim is filed.

**Article 6.         Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01   Assumption.** The Debtor assumes (i) the Community Services Contract, as amended, including the exercised option year extending performance through January 31, 2027' (ii) its insurance policies and related coverage rights, including Commercial General Liability Policy No. PHPK2645240-007 (Philadelphia Indemnity Insurance Company), Umbrella Liability Policy No. PHUB897118-007 (Philadelphia Indemnity Insurance Company), Cyber Risk / Internet Liability Policy No. PHSD1822094-002 (Philadelphia Indemnity Insurance Company), Automobile Liability Policy No. 73 APR 423130 (National Liability & Fire Insurance Company), and its health insurance arrangements with CareFirst; and (iii) its storage facility agreements with Extra Space Storage.

**Section 6.02   Supportive Rehabilitative Residence Services Contract.** The Residential Contract, as amended, shall remain in effect according to its terms through the expiration of the current option period on September 28, 2026, and shall expire thereby without further act of the parties. The Debtor shall perform its obligations thereunder through the completion of the residential wind-down described in Article 7 hereof, and nothing in this Plan shall constitute a rejection of said contract.

**Section 6.03   Leases of Operating Group Homes.** The Debtor presently operates group homes at two leased locations: 11 Jefferson Street NE, Washington, DC, and 3800 Pope Street SE, Washington, DC, each leased from Gwendolyn Bardwell. Said leases shall remain in effect through the completion of the residential wind-down, with the Debtor continuing to pay rent thereunder, as an administrative obligation, through the date on which the respective premises are vacated—anticipated to occur on or before July 26, 2026. Said leases are rejected effective as of the later of (i) the Effective Date; or (ii) the date on which the Debtor vacates the respective premises.

**Section 6.04   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 or addressed in Sections 6.02 and 6.03 hereof, including, without limitation, the leases of the group-home premises located at 309 Varnum Street NW, Washington, DC (Mikeyla Kidd) (closed June 22, 2026); 1495 Saratoga Avenue NE, Washington, DC (Daniel Odees) (closed June 26, 2026); and 651 11th Street NE, Washington, DC (Trustees of Peoples Community Church) (premises previously vacated; subject to pending landlord-tenant litigation, Case No. 2025-LTB-008262), in each case effective as of the Effective Date.

**Article 7.         Means for Implementation of the Plan**

The Plan will be implemented through cash on hand as of the Effective Date and the disposable income generated from the continued operation of the Debtor's business, principally its community-based behavioral health services under the Community Services Contract. The Debtor shall complete the orderly wind-down of its residential group-home operations in coordination with DBH, thereby eliminating the rent, staffing, and other fixed costs associated with those operations and permitting the Debtor to devote the income generated by its continuing operations to the payments required under the Plan.

9

The Reorganized Debtor shall make all payments required under the Plan in the amounts, at the times, and in the order of priority provided in Articles 3 and 4. Payments on the allowed secured portion of SBA's Class 1 claim shall be made separately from operating revenues and shall not reduce the quarterly Plan payments available for administrative expense claims, priority tax claims, Class 2 claims, and Class 3 claims. Except as otherwise provided in the Plan or the Confirmation Order, all property of the estate shall vest in the Reorganized Debtor on the Effective Date, subject to the liens, claims, and interests expressly preserved under the Plan, and the Reorganized Debtor shall be authorized to take all actions necessary or appropriate to consummate and carry out the Plan.

## Article 8.    General Provisions

**Section 8.01    Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02    Effective Date.** The effective date of this Plan is the first business day succeeding the date on which the confirmation order becomes a final, non-appealable order.

**Section 8.03    Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04    Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05    Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under chapter 7 of the Bankruptcy Code), as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06    Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check, or where available, direct deposit or auto debit.

**Section 8.07    Stamp/Conveyance Taxes.** Pursuant to Section 1146(a) of the Bankruptcy Code, and to the fullest extent permitted thereby, any conveyance pursuant to this Plan, which may be exempted from transfer or stamp tax, shall be so exempted.

**Section 8.08    Captions.** The headings contained in this Plan are for convenience of reference only, and do not affect the meaning or interpretation of this Plan.

**Section 8.09   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the District of Columbia govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.10   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder.  Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.11   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of Columbia shall retain jurisdiction of this chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.12   Modifications.** Modification of this Plan shall be governed by Section 1193 of the Bankruptcy Code.

**Section 8.13   Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the effective date, however, the Debtor shall be free to pay any post-confirmation fees incurred by counsel, or other professionals (including counsel and the guardian *ad litem* but excepting the Subchapter V trustee), without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court.

**Section 8.14   Fractional Distributions**. Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**Section 8.15** *De Minimis* **Distributions.** Notwithstanding anything to the contrary contained in the Plan, the Debtor shall not be required to distribute, and shall not distribute, cash or other property to the holder of any allowed claim—except for a priority tax claim—if any quarter in which the amount of cash or other property to be distributed on account of such claim is less than $100.00. Any amount so withheld shall be reserved and paid when the accumulated distribution to such claimant equals or exceeds $100.00 or with the final distribution under this Plan, whichever occurs first.

**Section 8.16   Governing Law.** Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the laws of the District of Columbia shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

**Section 8.17   Entry of a Final Decree**. The Debtor may file a motion with the Court to obtain the entry of a final decree at such a time as a discharge is to be entered in accord with the provisions of Article 9 hereof.

**Article 9.      Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

   (a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

   (b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in the 60th month succeeding the effective date.

**Section 9.02   Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.     Notice of Substantial Consummation**

**Section 10.01** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

*[Signature on Following Page]*

Respectfully Submitted,

Dated: July 14, 2026

/s/ Christianna A. Cathcart
Christianna A. Cathcart, Esq.
THE BELMONT FIRM
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
christianna@dcbankruptcy.com
*Counsel for the Debtor*

13